UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MID-CONTINENT CASUALTY CO., a
foreign corporation,
    Plaintiff,
v.                                                   CASE NO.: 6:09-cv-02009-ORL-35-KRS

DWIGHT HOLLOWAY & CO., a Florida
corporation d/b/a HOLLOWAY CUSTOM
HOMES; HOLLOWAY CUSTOM HOMES,
LLC, a Florida limited liability company;
DWIGHT D. HOLLOWAY; EDWARD
BATES, individually; JENNIFER BATES,
individually; WILLIAM F. STUHRKE, Ph.D,
P.E.; and ELIZALDE CARPENTRY
SERVICES, INC., a Florida corporation,
    Defendants.
_____/

DWIGHT HOLLOWAY & CO. d/b/a HOLLOWAY
CUSTOM HOMES; HOLLOWAY CUSTOM HOMES,
LLC, and DWIGHT D. HOLLOWAY,
    Counterclaim Plaintiffs,
v.

MID-CONTINENT CASUALTY CO.
    Counterclaim Defendant.
_____/

## HOLLOWAY'S RESPONSE TO MID-CON'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendants/Counter-Plaintiffs, DWIGHT HOLLOWAY & CO., d/b/a Holloway Custom Homes ("HCH"), HOLLOWAY CUSTOM HOMES, LLC ("HCH LLC") and DWIGHT D. HOLLOWAY ("DDH") (HCH, HCH LLC and DDH are collectively referred to herein as "HOLLOWAY"), and pursuant to Fed. R. Civ. P. 56, files this Response to MID-CONTINENT CASUALTY CO. ("MID-CON") Motion for Summary Judgment. [Doc. 118].

**I.**    **INTRODUCTION**

MID-CON has moved for summary judgment on three grounds, namely that: (1) HCH and John and Beverly Logan ("Logans") were involved in a joint venture and therefore there is no coverage for damages sustained to the property ("Home") acquired by EDWARD and JENNIFER

1

BATES ("BATES"), pursuant to Section II – WHO IS AN INSURED of both the "Initial Policy" and "Renewal Policy"; (2) the damages claimed by BATES are barred by the "CG 22 94 Endorsement" which was attached to the Renewal Policy and; (3) the claims of BATES are barred by Exclusions j(5) and/or j(6) of the Initial Policy and/or the Renewal Policy.

First, no joint venture existed between the Logans and HCH which would bar MID-CON's duty to defend or indemnify HOLLOWAY for the claims of BATES. The testimony of DDH and the Logans discloses that the fundamental elements necessary to establish a joint venture were lacking, and therefore MID-CON owes a duty to defend and indemnify HOLLOWAY.

Second, the CG 22 94 Endorsement, attached to the Renewal Policy is inapplicable, and therefore does not exclude coverage under the completed operations of HCH. As noted in HOLLOWAY's Motion for Summary Judgment, MID-CON failed to apprise HCH and HCH LLC of the substantial and material changes to the Initial Policy and the non-renewal of coverage both as required by §627.4133, Florida Statutes and MID-CON's own Initial Policy and Renewal Policy.

Lastly, Exclusions j(5) and j(6) are applicable only for ongoing operations. Furthermore, these exclusions are applicable only to **"that particular part"** of the property which was incorrectly performed. The work of HCH, as required under the "Contract for Construction" of the Home was completed **before** the alleged manifestation of the loss as alleged by the BATES in the Underlying Complaint. Even if damage occurred during operations, only the defective work of the subcontractor performing work on **"that particular part"** of the property would be excluded, but the otherwise completed work of other trades would not be excluded.

## II.     DISPUTE AS TO MIDCON's STATEMENT OF UNDISPUTED FACTS

HOLLOWAY disputes the following paragraph contained in MID-CON's Statement of Undisputed Material Facts. [Doc. 118].

1. Paragraph 6: This is a legal conclusion and is directly in contravention to §627.4133, Florida Statutes and the Initial Policy and the Renewal Policy [Doc. 108-7 and 108-8].

2. Paragraph 8: Ms. Jennifer Moore was not employed by MID-CON at the time the "Template Form Letter" [Doc. 108-63] was allegedly sent only to HCH. [See Ex. 1, Depo. of Jennifer Moore, 5:10-16]. Therefore, Ms. Moore could have no personal knowledge as to whether the Template Form Letter was returned as undeliverable.

3. Paragraph 9: There is no supporting citation to the record for this supposedly undisputed material fact.

4. Paragraph 12: DDH did not recall whether it was his custom or practice to read the policies upon receipt. [Doc. 113, Ex. F, 73:3-5].

5. Paragraph 15: The testimony of DDH does not indicate that he found a lot that he wanted to build a spec home on. DDH testified that he found a lot that he did not want to take on the debt and build as a spec. [See Ex. 2, Depo. of DDH, 48:17-49:22].

6. Paragraph 16: The testimony of DDH did not indicate that the Logans agreed to build the house with HCH as an investment. The testimony of DDH stated that Logan intended to build the house and hired HCH to build it for him. [Doc. 113, Ex. F, 45:1-12]. In fact, the arrangement between the Logans and HCH was an opportunity for HCH to pass on to the Logans a building project and for the Logans to have an opportunity to step in instead. [Doc. 113, Ex. F, 82:6-19].

7. Paragraph 17: The agreement that is being referred to in the citations referenced by MID-CON relates only to the Contract for Construction [Doc. 108-6] entered into by and between the Logans and HCH.

8. Paragraph 20: Although the Logans and HCH entered into an agreement with reference to the sharing of the gross margins, this agreement did not ensure HCH a profit. In order

3

to determine whether there was a profit, HCH would need to subtract its operating costs from whatever proceeds were received, in order to determine whether HCH made a profit. [See Ex. 2, Depo. of DDH, 51:23-52:23].

9. Paragraph 22: It was only John Logan's belief that HCH requested an indemnity agreement in order for the repairs to come out of the gross margins. [Doc. 113, Ex. G, 77:18-78:14].

10. Paragraph 23: Although the questions asked of DDH referred to the scope of work, the Contract for Construction specifically provided that "[n]o changes in the contract or specifications, or any addendum shall be made or performed unless in writing, signed by the Buyers and Sellers. [Doc. 108-6]. Any changes in work shall be subject to the terms and conditions set forth by the parties in writing." [Doc. 108-6, heading "Change Orders"]. The Construction Contract further provided that "[r]evisions to this Contract shall be in writing, executed by the parties and attached hereto as an addendum except as noted." [Doc. 108-6, heading "Other Agreements"].

11. Paragraph 46: The reference by MID-CON's expert, Mr. Dombrowski, that the house was not put to its intended use before the issuance of a certificate of occupancy, presupposes that the Contract for Construction states that completion equates to a certificate of Occupancy. [Doc. 108-6, heading "Completion/Occupancy"]. In fact the Contract for Construction only indicates that possession shall be delivered to the Buyer upon the issuance of the certificate of occupancy. [Doc. 108-6, heading "Completion/Occupancy"]. Except for the use of the term "completion" in the heading, this cited paragraph does not define "completion". Instead, the Contract for Construction specifically states that "[t]he headings given in the paragraph herein shall have no effect or consideration in the construction of the agreement, but are used only for the convenience of the parties." [Doc. 108-6, heading "Completion/Occupancy"].

4

12. HOLLOWAY further relies on the Undisputed Facts and the Summary Judgment Standard as contained in their Motion for Partial Summary Judgment. [Doc. 112].

### III. MEMORANDUM OF LAW

#### A. HCH and the Logan's Agreement is not a Joint Venture and thus Coverage Exists for BATES' Claims

##### 1. The Five Required Elements of a Joint Venture

In order to create a joint venture, a contract must contain each of the following five elements: "(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a **duty** to share in any losses which may be sustained." Kislak v. Kreedian, 95 So. 2d 510, 514-15 (Fla. 1957)(emphasis added). The absence of any one of the elements precludes a finding of a joint venture. Jackson-Shaw Co. v. Jacksonville Aviation Authority 8 So.3d 1076 (Fla. 2008) citing USA Independence Mobilehome Sales, Inc. v. City of Lake City, 908 So. 2d 1151, 1158 (Fla. 1st DCA 2005). Moreover, in a joint venture, the parties have the right and authority to bind the others with reference to the subject matter of the joint venture. Kislak, 95 So. 2d at 514-15. The standard has been construed strictly such that the **absence of even one of the five elements precludes a finding of joint venture.** Id. (emphasis added).

When applying the facts of the instant case to each required joint venture element, it is clear that the agreement between the Logans and HCH did not have the necessary elements to constitute a joint venture. As to be shown *infra.*, (1) there was no joint control or right to control the respective duties and obligations incurred by the parties with respect to the Home; (2) there was no expressed duty to share in any losses; (3) in the event of a default in the construction loan, the Logans alone were liable; and (4) each of the parties had differing liabilities, costs, and expenses.

###### i. No Joint Control or Proprietary Interest

5

It is undisputed that the Logans were the only owners of the Home. It is also clear that HCH was not a party to the construction loan involving the Logans, as borrowers, and Federal Trust Bank, as lender. [Doc. 108-20, Doc. 108-23]. The only borrowers on the loan were the Logans -- not DDH, HCH or HCH LLC. [See Ex. 3, Depo. of Jody Schmidt, 13:3-4; Ex. 4, Depo. of John Logan, 87:25-88:12]. The Logans borrowed the money to build the house. [See Ex. 2, Depo. of DDH, 50:16-18]. Furthermore, all draw requests under the loan with Federal Trust Bank required the approval of the Logans as they were the obligors/mortgagors. [Ex. 2, Depo. of DDH, 55:22-56:10]. It is also clear that the Logans, through the use of the loan with Federal Trust Bank, solely acquired the property and funded the construction. [Ex. 4, Depo. of John Logan, 14:19-15;15; 86:12-87:3]. With the Logans being the only fee title holders and the only ones obligated on the construction loan, there could not have been a joint proprietary interest, and therefore, no joint control. These facts alone establish that there was no joint venture.

Furthermore, as disclosed by the City of Winter Park's documents, HCH was the contractor for the Home.[1] [Doc. 108-81]. As contractor, only HCH as the permit holder - not the Logans - was the party responsible for all subcontractors. The Logans would not be permitted to or participate in the contracting for the construction of the home as such would be a violation of Chapter 489, Florida Statutes.

### ii. The Losses and Expenses

There was never an actual agreement between the parties in the event of a loss. According to John Logan, there was no discussion about the event of a loss. [See Ex. 4, Depo. of John Logan, 97:24-98:13]. Only the Logans would be liable for the loan with Federal Trust Bank in the event of a default. [See Ex. 4, Depo. of John Logan, 88:23-89:8].

---

[1] The depo of DDH (Ex. 2, Depo. of DDH, 171; 16-172:8) discloses that HCH - **not** HCH LLC- was the contractor.

6

It was the Logans' responsibility alone to acquire and carry the loan and HCH did not share in those expenses. [See Ex. 4, Depo. of John Logan, 89:15-25]. The interest expense with respect to the loan with Federal Trust Bank was the Logans alone. [Ex. 2, Depo. of DDH, 54:3-12]. Conversely, it was HCH's responsibility to construct the home, as well as the obligations arising there under, and the Logans did not share in those expenses. [Ex. 4, Depo. of John Logan, 90:1-10]. Therefore, the expenses incurred by the respective parties were discrete. [Ex. 4, Depo. of John Logan, 90:14-18]. Neither HCH nor the Logans owed a duty to the other for the losses undertaken by the other, as each party was independently and separately liable for its own obligations. This made each party's losses and exposures distinct. Again, these facts establish that there was no joint venture as one of the required elements to establish same is lacking.

## 2. Other Cases Interpreting Whether a Joint Venture Exists

In USA Independence, the tenant, a mobile home dealer, brought an inverse condemnation action against both the City, who acquired the land, as well as the county, who agreed to construct the widening of the road adjacent to the subject property. USA Independence Mobilehome Sales v. City of Lake City, 908 So.2d 1151. In naming the County, the Plaintiff alleged that the actions of the County and the City constituted a joint venture, for which each were responsible for the damages sustained by the Plaintiff. Id. The County conceded that a verbal agreement existed between it and the City, by which the City agreed to purchase the property and the County agreed to let the contract for construction. Id. On appeal, Florida's First District Court of Appeals determined that the County had not taken title to the land, and therefore there was no joint proprietary interest. Id. With no joint proprietary interest, there could be no joint control or right to control. Id. The Court further noted that although the City and the County shared "a community of interest in the performance of the common purpose", the losses that the City and the County stood

to suffer were distinct. Id. The County's exposure arose out of dealings with construction contractors, while the City's risk related to the purchase of the land. Id.

The facts of the USA Independence are analogous to the facts at hand. Like the City, only the Logans were the landowners, and as landowners, their liability related to their singular ownership. HCH, like the County, had exposure for the construction work and said exposure did not pass to the land owners, the Logans. The similarity of USA Independence to the facts at hand demonstrates that there was not a joint venture between the Logans and HCH; thus, MID-CON's joint venture defense is inapplicable.

It is also clear that unless there is a duty to share in the parties' respective losses, no joint venture exists. This, like all of the other factors, is indispensible to a joint venture. See Albert Pack Corp. v. Fickling Prop., 200 So. 907 (Fla. 1941). (Joint venture did not exist by virtue of agreement whereby property which defendant purchased through plaintiff was to be resold and profits divided between them; Plaintiff was not bound to share in the losses, if any, which might result from the resale of the property).

All of the cases cited by MID-CON are distinguishable because none address the issue of whether joint venture actually existed but rather the parties in those cases acknowledged that a joint venture existed. In Discover Prop. and Cas. Ins. Co. v. Lexington Ins. Co., 664 F. Supp. 2d 1296 (S.D. Fla. 2009), there was no analysis as to whether the agreement of the grocery store and the dry cleaning companies was or was not, in fact, a joint venture. Although the auto carrier for the grocery store, who paid the claim under its policy, attempted to argue that the relationship of the defendants in the underlying action was that of an independent contractor, the analysis went no further. Id. The Southern District Court concluded that this analysis was irrelevant because the Declarations designated the insured, Albertson, Inc., as a "FOOD/DRUG STORE". Id. There was no mention of dry cleaning services in the declarations page of Albertson's CGL Policy with

Lexington. These facts are contrary to the issues at hand. HOLLOWAY has been sued for activities resulting from construction, which is clearly within the insured risk undertaken by MID-CON. The Declarations page of the Initial Policy and the Renewal Policy explicitly insure HCH and HCH LLC for "HOME BUILDER" activities. [Doc. 108-7 and 108-8].

In Bott v. Mid-Continent Cas. Co. 299 F. 3d 508 (5th Cir. 2002), two parties, acknowledged to acting under a joint venture, sought additional insured status for the joint venture from a sub-contractor's carrier. Although one of the joint venture parties was named as an additional named insured, the joint venture, itself, was not, so no coverage was afforded to the joint venture. Id. Again, there was no analysis as to whether there was, in fact, a joint venture, because it was not in dispute by those parties.

However, in the case *sub judice*, the evidence is patent that there was no joint venture between the Logans and HCH. Each had separate and independent liabilities. There was also no joint ownership in the subject property, and therefore there can be no proprietary interest or joint control. The expenses that each were independently responsible for were theirs, and theirs alone. Furthermore, the claims of the BATES, relevant to the alleged construction issues associated with the Home, were specifically assumed risks associated with the Initial Policy and the Renewal Policy, which acknowledged the business description of the insureds as "HOMEBUILDER". [Doc. 86-3 and 108-7] and [Doc. 86-4 and 108-8].

### 3. The Existence of a Joint Venture is a Question of Fact

Even if the Court is not persuaded by the arguments above that the facts of this case do not support the existence of a joint venture, the Courts of Florida have consistently held that the existence of a joint venture presents a factual question for the trier of fact. See USA Independence, 908 So. 2d at 1154; see also, Kaplan v. Wolff, 198 So. 2d 103 (Fla. 3d DCA 1967) and Navaro v. Espino, 316 So. 2d 646 (Fla. 3d DCA 1975). Therefore, entry of summary judgment with respect

to this issue would be inappropriate.

### B. Coverage is Not Excluded by the "Your Work" Exclusion

MID-CON's entire position relevant to the "your work" exclusion is premised on the flawed argument that that the Renewal Policy, not the Initial Policy, is the relevant policy for this Court's consideration. This argument assumes that the construction activities were **not** complete prior to the inception of the Renewal Policy, which is disputed. Even assuming *arguendo*, that the Renewal Policy is the relevant policy, MID-CON's argument presupposes that the CG 22 94 Endorsement is legally enforceable and lawfully formed a part of the Renewal Policy. For the reasons stated in BATES' Motion for Partial Summary Judgment [Doc. 111], HOLLOWAY's Motion for Partial Summary Judgment [Doc. 112], and herein, neither argument should be deemed persuasive.

#### 1. The Renewal Policy is not the Relevant Policy as Completion of the Contract Work Occurred During the Initial Policy

MID-CON posits that the completion of the Home took place **after** inception of the Renewal Policy in order to attempt to take advantage of the CG 22 94 Endorsement, which it claimed, in its Template Form Letter, that said endorsement "**may restrict coverage**". [Doc. 108-63 – "MCC 000281" and "MCC 000282"]. By arguing completion and manifestation during the Renewal Policy, MID-CON is **not** asserting a "may restrict coverage", but instead a **total lack of coverage** by virtue of said endorsement. In support of this completion date, MID-CON cites to minor work that may have taken place during the Renewal Policy period. MID-CON's citation to these minor work items does **not** demonstrate that the work required under the Contract for Construction was **not** already complete. These minor work items were either punchlist matters, corrective work, or additional work separate and apart from the Contract for Construction to improve marketability of the Home.

As Bates set forth in their Motion for Partial Summary Judgment [Doc. 111] addressing completion issues, completion is defined in both the Initial and the Renewal Policy, as follows:

> SECTION V – DEFINITIONS
> 16.   The "Products-completed operations hazard":
> a.   Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
> (2) Work that has not yet been completed or abandoned. However, *"your work" will be deemed completed at the earliest of the following times*:
> (a) When all the work called for in your contract has been completed.
> \* \* \*
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
> **Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.**

[Doc. 108-7 and 108-8] (emphasis added). Under either definition of completion, the Home was complete prior to the inception of the Renewal Policy. Provisions of a policy, defining insuring or coverage clauses, are construed in the broadest possible manner to effect the greatest extent of coverage. See Westmoreland v. Lumbermens Mutual Cas. Co., 704 So. 2d 176 (Fla. 4th DCA 1997). When a carrier fails to define a term in an exclusion or limitation, it cannot insist upon a narrow, restrictive interpretation of the coverage and these terms must be liberally construed in favor of the insured. Id. at 180; State Farm Fire and Cas. Co. v. CTC Develop't Corp., 720 So. 2d 1072 (Fla. 1998); Container Corp of Amer. v. Maryland Cas. Co., 707 So 2d. 733, 736 (Fla. 1998).

### i.   The Home was "Put to Its Intended Use" as Early as August 2005

The intended use for the Home from the Logans' perspective, as owners, was to sell the house. [Ex. 2, Depo. of DDH, 47-52]. The realtor, Mick Night, put the Home to its intended use by showing the Home to prospective buyers as early as August 5, 2005, as reflected in Mr. Night's testimony and his calendar print-out. [Ex. 5, Depo. of J. Michael Night, 42:14-43:3]; [Doc. 108-25].

As can be seen from the case cited by BATES in their Motion for Summary Judgment [Doc. 111], the United States District Court for the Middle District of Pennsylvania held that the use of the home by a real estate agent to sell the property constituted putting the home to its intended use for

purposes of considering the home complete. Penn Nat'l Ins. v. HNI Corp., 482 F. Supp. 2d 568, 579-80, 612 (M.D. Pa. 2007).

### ii. The Construction Work was Completed by November 8, 2005

Alternatively, the Home was "completed" no later than November 8, 2005 pursuant to the other policy definition of completion, i.e. the completion of all work called for in the contract other than "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete." [Doc. 108-7 and 108-8]. The construction lender, Federal Trust Bank, conducted periodic inspections of the Home to monitor progress for the purpose of disbursing draws under the construction loan. [Ex. 3, Depo. of Jody Schmidt, p. 14-15]. The bank prepared a loan disbursement reports, showing the dates of the inspections, the percentage complete at the inspection and the amount of the loan disbursed following the inspection. [Ex. 3, Depo. of Jody Schmidt, 14-15; Doc. 108-49]. The bank's representative, Jody Schmidt, testified that the Home was 98% complete as of November 8, 2005 based on her review of the bank's inspection records. [Ex. 3, Depo. of Jody Schmidt, p. 27-29]. In adding up the percentages listed on the loan disbursement report marked as Exhibit 65-A [Doc. 108-49] the record demonstrates that the Home was actually 100% complete as of November 8, 2005. [Doc. 108-49].[2] She confirmed that math in her testimony and also confirmed that the final survey, which is not typically ordered until the builder tells the bank that a house is complete, was issued for the Home on November 17, 2005. [Ex. 3, Depo. of Jody Schmidt, 31:18-32:9; 32:22-33:5].

Bates' expert, Robert Robinson, a licensed general contractor and engineer, also testified that the Home was complete in early November 2005 based on his review of records. [Ex. 6, Depo. of Robert Robinson, 25:19-26:2]. He opined that the Home was "substantially complete" by that time and that the only work performed after that time was punch list work and work that was added to the scope but not part of the original plan. [Ex. 6, Depo. of Robert Robinson, 26:3-14].

---

[2] The numbers in the draw # and % column total 100 when added together. (10+10+4+6+13+10+18+14+11+4=100.)

## 2. The CG 22 94 Endorsement is Inapplicable to the Renewal Policy

Even if the Court were to conclude that the house was not complete prior to the inception of the Renewal Policy, coverage for the completed operations would still be afforded to HOLLOWAY, as the CG 22 94 Endorsement cannot form a part of the Renewal Policy due to MID-CON's failure to comply with both its policies of insurance as well as Section 627.4133, Florida Statutes. For the sake of brevity, HOLLOWAY will not reiterate its arguments relevant to this issue as HOLLOWAY previously addressed them at length in its Motion for Partial Summary Judgment. [Doc. 112, pages 16-24]. Simply put, the misleading language of the Template Form Letter failed to sufficiently inform and notify all of the insureds, namely HCH and HCH LLC, of the material and substantial changes to the Initial Policy through the attempted inclusion of the CG 22 94 Endorsement in the Renewal Policy.

## C. Not all Damages are Excluded From Coverage by the j(5) and j(6) Exclusions

HOLLOWAY disputes that the damages manifested before construction was complete, and therefore Exclusions j(5) and j(6) would have no application to completed operations. However, even if this Court were to find that the claimed damage occurred during operations, MID-CON's interpretation and reliance on <u>American Equity Ins. Co. v. Van Ginhoven</u>, 788 So.2d 388 (Fla. 5th DCA 2001), <u>Oak Ford Owners Assoc. v. Auto-Owners Ins. Co.</u>, 510 F.Supp.2d 812 (M.D. Fla. 2007), and <u>Amerisure Mut. Ins. Co. v. American Cutting & Drilling Co.</u>, 2009 WL 700246 (S.D. Fla. March 17, 2009) is misplaced because Exclusions j(5) and j(6) only exclude coverage for "**that particular part**" of the property that it defective, and not the entire Home.

In both the Initial and Renewal Policy, Exclusions j(5) and j(6) read:

> j.   Damage To Property
> (5)   That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6)   That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

[Doc. 108-7 and 108-8]. In both the Initial and Renewal Policy, the definition of "Your Work" is:

> SECTION V – DEFINITIONS
> 22. "Your Work":
>     a. Means:
>         (1) Work or operations performed by your or on your behalf; and
>         (2) Materials, parts or equipment furnished in connection with such work or operations.
>     b. Includes
>         (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
>         (2) The providing of or failure to provide warnings or instructions.

[Doc. 108-7 and. 108-8].

As can be seen, these exclusions only apply to **"that particular part"** of the damaged property that occur during operations. The use of the terms **"that particular part"** remain undefined in the both Policies. Instead, MID-CON is attempting to apply the "Your Work" definition to Exclusions j(5) and j(6). If MID-CON wanted the "Your Work" definition to apply to Exclusions j(5) and j(6), it was incumbent to MID-CON, as the drafter of the Policies, to do so in clear, unmistakable language. See Progressive Ins. Co. v. Estate of Wesley, 702 So. 2d 513 (Fla. 2d DCA 1997). However, MID-CON having failed to to insert "Your Work" in place of "that particular part", it must be held accountable for the terms, definitions and conditions of its Policies as drafted. See Westmoreland v. Lumbermens Mutual Casualty Co., 704 So. 2d 176, 179 (Fla. 4th DCA 1997); Hudson v. Prudential Prop. And Cas. Ins. Co., 450 So. 2d 565, 568 (Fla. 2d DCA 1984); Indian Harbor Insurance Co. v. Williams, 998 So. 2d 677, 678 (Fla. 4th DCA 2009).

Even if damage manifested itself during operations, only "that particular part" of the property which was incorrectly performed is excluded from coverage. The incorrect work performed, as alleged by BATES, primarily related to the floor and roof trusses as well as the CMU support piers and ledger system. [Doc. 86-1, ¶45]. No other work performed by HCH's subcontractors is related to these claimed deficiencies. The correctly performed work of other subcontractors which was damaged does not fall within the defined j(5) and j(6) Exclusions and is thus covered.

14

### 1. **Exclusion j(5) and j(6) Cases Relied Upon By MID-CON**

With respect to the Van Ginhoven decision, the damages resulting from draining the pool immediately manifested while the contractor was performing his operations. Van Ginhoven, 788 So.2d 388. At the time of the occurrence, the contractor was physically draining the pool in order to clean the pool surface and repair the pool tile. Id. "That "particular part of the property being worked on by the contractor at the time of the damage was the entire pool itself. Id. Therefore, it was appropriate pursuant to Exclusions j(5) and j(6) to bar the claims for the damage to the pool. Id. It is important to note that the carrier did not deny coverage for the damage to the surrounding equipment, which the contractor was not actively working on, as damage to that property was not damage to "that particular part" of the property that the contractor was actively performing work. Id. Unlike the Van Ginhoven decision, the alleged defective work in the case *sub judice* was performed much earlier in the operations, as construction activities could not continue until the floor and roof trusses were in place. It further bears mentioning that the Van Ginhoven decision was decided prior to J.S.U.B., Inc. v. U.S Fire Ins. Co., 979 So.2d 871 (Fla. 2007), which moved away from the traditional expansive reading of earlier decisions, due in part, to changes in the standard CGL policy. See Oak Ford, 510 F. Supp. 2d at 819.

In the Oak Ford decision, again, Exclusions j(5) and j(6) were held to bar coverage for vegetation damage to the banks of the water body where the insured was actively depositing fill material. Id. Again, the damage was excluded because the damage to the vegetation was "that particular part" of property that the insured was actively performing operations at the time of the loss. Id. In the instant case, with respect to the damage to the Home, even if operations were ongoing at the time the damages manifested themselves, "that particular part" of the property (the floor trusses) which later caused damage to the correctly performed and subsequent work of other

subcontractors, had long since been completed. In other words, there were no active operations on **"that particular part"** of the property which caused damage.

In American Cutting & Drilling, a subcontractor was hired to chip concrete to enlarge existing holes. American Cutting & Drilling Co., 2009 WL 700246 (S.D. Fla. March 17, 2009). While performing these operations, the subcontractor cut existing cables. Id. The subcontractor was working on that particular area when the damage to the cabling occurred. Id. The court held that Exclusions j(5) and j(6) were applicable. Id. There was no question in the American Cutting case that damage occurred while the contractor was performing work on" that particular part" of the property. Id. Again, however, in the present action, the damage which resulted to the Home did **not** occur while "that particular part" of the job, (the floor and roof trusses) were being performed. Instead, the damage did not manifest until after the floor and roof trusses were complete.

The cases cited by MID-CON as distinguishable because in those cases, the damages manifested immediately **during** the operations on "that particular part" of the job on which work was then being performed. Conversely, the facts here are clear that the alleged defective work (floor and roof trusses) resulted in/caused damage later in time (after floor and roof trusses were completed) and damage to the correctly performed work of other trades. The damages sustained to the Home were not contemporaneous to the performance of the alleged defective work.

### 2. **Drafting History and ISO Circulars- Exclusion j(5) and j(6)**

The history of the availability of construction defect coverage in Florida for general contractors under CGL policies has changed dramatically in the last several years. There are two leading authorities that detail the ISO drafting history as it relates to Exclusions j(5) and j(6): Scott C. Turner, Insurance Coverage of Construction Disputes, §29, 32 (2d ed. 2009) and Patrick J. Wielinski, Insurance for Defective Construction: Beyond Broad Form Property Damage Coverage, Ch. 9 and 10 (2nd ed., International Risk Management Institute, Inc., 2005). See also, Michael F.

16

Aylward et al., Problem Issues in CGL 153 (2001); Gibson, Broad Form Property Damage Coverage in the New CGL, Risk Report, Nov. 1986, at 6; Hendrick & Wiezel, The New Commercial Liability Forms-An Introduction and Critizue, 36 Fed'n Ins. & Corp. Couns. Q 319, 364 (1986); Craig F. Stanovich, Faulty Work and the CGL (2005), at http://www.irmi.com/Expert/Articles/2005/Stanovich07.aspx.

An analysis of the drafting history is taken in J.S.U.B. and Pozzi. J.S.U.B., 979 So. 2d 871 and Auto Owners Ins. Co. v. Pozzi Window Co., 984 So. 2d 1241 (Fla. 2008). The Florida Supreme Court devoted a section entitled "The Origin and Evolution of CGL Policies" in its opinion, wherein the Court discussed the 1976 and 1986 Broad Form Endorsements. J.S.U.B., 979 So. 2d at 878-879. In particular, the Court mentioned that the 1986 Broad Form Endorsement contained a, "[n]ew exclusion j(6) and the exception to this exclusion clearly stated that the exclusion for faulty workmanship did not apply to work within the products-completed operation hazard." Id. at 879. The Court explains that the ISO Circular dated, "July 15, 1986 [confirmed] that the 1986 revisions to the standard CGL policy not only incorporated the "Broad Form" property endorsement but also specifically **"cover[ed] damaged caused by faulty workmanship to other parts of work in progress**; and damage to, or caused by, a subcontractor's work after the insured's operation were completed." Id. (emphasis added) citing ISO Circular, Commercial General Liability Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986). Clearly, Florida Supreme Court recognized that the drafting history of the subject CGL Policies clearly showed that the post-1986 CGL form was intended to provide broader coverage in the construction defect setting than the predecessor forms.

As the Florida Supreme Court recognized the significance of the drafting history, a review of the January 29, 1979 ISO Circular is instructive as it gives specific examples showing the intended application of Exclusions j(5) and j(6). It provides:

17

... This paragraph is intended to precisely define the extent to which damage to property on which the insured is actually working is to be excluded.

...Under this care, custody or control exclusion [the 1973 policy without the Broad Form coverage], if the general contractor who is in charge of a project damages a portion of it, the damage is excluded even though that portion may be work being performed by a subcontractor. On the other hand, if a subcontractor damages some portion of the job beyond his own scope of operations, the damage would be covered. The intent under these [new Broad Form] endorsements is to give the same coverage to both the general and subcontractor for damage arising out of their own operations and to exclude only damage to the particular property on which the insured is working.

The [new Performing Operations] exclusion **is intended to apply only to the part of the property on which the operations are being performed.** In this context, "property" is intended to mean any unit of property which may become the subject of liability. **For example, consider an insured subcontractor who is erecting steel beams furnished to him by the general contractor. Having erected four steel beams, the subcontractor is in the process of erecting a fifth steel beam and this beam falls, resulting in damage to all five beams. "That particular part" of the property would be the fifth beam.**

... This clause excludes the property on which the insured is actually working at the time of the property damage. It also excludes property damage caused by subcontractors of the insured while they are actually working on the property. **Where the damage caused by the insured in the performance of his operations goes beyond damage to the property on which he is working, this section limits the exclusion to the particular part on which he is working.**

[See Ex. 7]. The following were specific examples used in the 1979 ISO Circular:

Contractor replaces relief valve on a pressure vessel. As he is testing the vessel, it bursts because the relief valve does not function. Covered with respect to the pressure vessel. Only the valve ("that particular part") is excluded.

Painter is burning paint off a house with a torch and sets fire to house. Covered except for "that particular part" to which the torch was applied.

[See Ex. 7]. Case law from across the country has recognized the narrowness of the applicability of Exclusions j.(5) and j.(6) relative to the "that particular part" limitation.[3]

---

[3] See Fejes v. Alaska Ins. Co., Inc., 948 P.2d 519 (Alaska 1999); Baugh Constr. Co. v. Mission Ins. Co., 836 F.2d 1164 (9th Cir. 1988); Econ. Lumber Co. v. Ins. Co. of N. Am., 157 Cal. App. 3d 641 (Cal. App. 1st Dist. 1984); Dorchester Dev. Corp. v. Safeco Ins. Co., 737 S.W.2d 380 (Tex. App. 1987, *no writ*); C. O. Falter, Inc. v. Crum & Forster Ins. Cos., 361 N.Y.S.2d 968 (N.Y. Sup. Ct. 1974); E&R Rubalcava Constr., Inc. v. Burlington Ins. Co., 147 F. Supp. 2d 523 (N.D. Tex. 2000); Pinkerton & Law, Inc. v. Royal Ins. Co., 227 F. Supp. 2d 1348 (N.D. Ga. 2002); Dorchester Dev. Corp. v. Safeco Ins. Co., 737 S.W.2d 380 (Tex. App. Dallas 1987); see also, Wielinski, Insurance for Defective Construction: Beyond Broad Form Property Damage Coverage, Ch. 9 and 10.

As noted above, this drafting history clearly shows that Exclusions j(5) and j(6) would not apply to the type of loss at issue in the instant case. It is clear, under the Florida Supreme Court's analysis of these issues, that the drafting history and narrow interpretation of the exclusions are appropriate under Florida's rules for insurance policy construction. At a minimum, the divergence of case law across the country regarding said exclusions represents "proof of the pudding" of ambiguity which is appropriately found where the reasoned judgment of numerous courts comes to opposite or differing conclusions from a study of essentially the same policy language. Security Ins. Co. of Hartford v. Investors Diversified Ltd., 407 So. 2d 314, 316 (Fla. 4th DCA 1981). This Court can, and should, issue a declaratory judgment holding that Exclusions j.(5) and j.(6) and the "that particular part" limitations, do not apply to the facts in the instant case.

It is undisputed that the construction of the Home occurred, as all construction occurs, in stages. At an early stage, the support trusses were installed by a subcontractor. It is at this early stage that the subcontractor made its errors, which errors eventually resulted in the settlement of the Home. Subsequent to this stage of construction, additional construction activities were performed by various other subcontractors. **In other words, it is undisputed that no operations were ongoing as to the support trusses when damages to the Home manifested.** Even assuming, arguendo, that Exclusions j.(5) and j.(6) apply, a fact question remains as to whether the damages occurred during operations, thus triggering j.(5) and j.(6), or after operations were complete, triggering the "your work" exclusion l and the CG 22 94 Endorsement.

## IV.   CONCLUSION

MID-CON's Motion for Summary Judgment should be denied. The testimony of DDH and the Logans is clear that the fundamental elements necessary to establish a joint venture were lacking. The CG 22 94 Endorsement, attached to the Renewal Policy [Doc. 108-8], is inapplicable and therefore does not exclude coverage under the completed operations of HCH. MID-CON failed

19

to apprise HCH and HCH LLC of the substantial and material changes to the Initial Policy and non-renewal of coverage both as required by §627.4133, Florida Statutes and MID-CON's own Initial Policy and Renewal Policy. Likewise, Exclusions j(5) and j(6) are equally inapplicable to the bulk of the claimed damages by BATES as Exclusions j(5) and j(6) are applicable only for ongoing operations. Furthermore, these exclusions are applicable only to **"that particular part"** of the property which was incorrectly performed. The work of HCH was completed well before the alleged manifestation of damages as alleged by BATES in the Underlying Complaint. [Doc. 86-1]. Even if damage occurred during operations, only the defective work of the subcontractor performing work on "that particular part" of the Home would be excluded.

### **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of June 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to Hinshaw & Culbertson,LLP, 9155 Dadeland Boulevard, Suite 1600, Miami, FL 33156-2741, Attn: Ronald L. Kammer, Esq. at rkammer@hinshawlaw.com and Melissa A. Gillinov, Esq. at mgillinov@hinshawlaw.com; Broad and Cassel, 390 Orange Avenue, Suite 1400, Orlando, FL 32801, Attn: Robert Alfert, Jr., Esq., ralfert@broadandcassel.com; W. Marvin Hardy, III, LLC, 1209 Belleaire Circle, Orlando, FL  32804, Attn: W. Marvin Hardy, III, Esq., wmarvinhardy3@live.com.

            BOYLE, GENTILE, LEONARD & CROCKETT, P.A.
            Attorneys for HOLLOWAY
            2050 McGregor Boulevard
            Fort Myers, FL 33901
            Telephone: (239) 337-1303
            Facsimile: (239) 337-7674

            By: /s/ Mark A. Boyle, Sr.
               Mark A. Boyle, Sr.
               FBN: 0005886
               MBoyle@BoyleGentileLaw.com

            By: /s/ Michael W. Leonard
               Michael W. Leonard
               FBN: 0855626
               MLeonard@BoyleGentileLaw.com